UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMES JOSEPH                              CIVIL ACTION

VERSUS                                    No. 07-3615

OMEGA PROTEIN, INC.                       SECTION:  I/1

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### BACKGROUND

Plaintiff, James Joseph("Joseph"), filed this action against his employer, Omega Protein, Inc., ("Omega") after he allegedly injured his right shoulder and lower back on June 13, 2007 while working aboard the F/V GRAND CHENIERE, a pogey fishing vessel owned and operated by Omega.[1] Plaintiff alleges that he fell down a metal stairway while investigating a diesel fuel spill. According to Joseph, his injury resulted from Omega's negligence, a claim which arises under the Jones Act, and the unseaworthiness of the vessel, a claim which arises pursuant to general maritime law. Joseph also alleges that he is entitled to maintenance and cure from Omega because he has not reached maximum medical improvement and that Omega has denied or unreasonably delayed payments for maintenance and cure.[2]

---

[1] Rec. Doc. No. 1, p. 2, para. VIII; Rec. Doc. No. 61, p. 3.

[2] Rec. Doc. No. 1, p. 2, para.  XIII.

Omega disputes the accident, responding that no one witnessed it and crewmembers did not notice any physical indications that plaintiff fell down metal stairs.[3] Omega claims that when Joseph reported the accident, he never mentioned that he slipped due to diesel or any other slippery substance and that he refused to participate in Omega's accident investigation.[4] Omega also contends that the stairway that plaintiff alleges he slipped on was safe and that there had never been a report that the stairway created a hazard.

During a two-day bench trial, plaintiff testified that he slipped and fell down a metal stairway after diesel collected on his boots.[5]  According to plaintiff, his slip and fall occurred after Captain Matthews Gaskins ("Gaskins") ordered him to investigate and report to the engineers a diesel fuel spill of which he and the captain had been made aware.[6]

Plaintiff testified that pursuant to Gaskin's orders, he walked from the wheelhouse, where he and the captain first became aware of the spill, to the stern of the vessel in order to find the spill location. He testified that the refrigeration room was

---

[3] Rec. Doc. No. 61, pp. 4-7.

[4] *Id.*

[5] Testimony of James Joseph.

[6] Plaintiff testified that he and the captain smelled diesel fuel, saw fuel in the water, and received a call from a passing boat that the fishing vessel was leaking fuel.

"flooded out with fuel" and that there was also diesel fuel on the deck outside of the refrigeration room. According to plaintiff, diesel fuel had spilled out of an overflow tank located outside the refrigeration room.

Plaintiff testified that after locating the diesel spill in the refrigeration room, he called out the names of the engineers while still in the room. Plaintiff testified that he received no response and that he then went to the galley where he found the engineers and informed them of the diesel fuel spill. According to plaintiff, he then walked up the stairway to the wheelhouse and reported his findings to Gaskins. He testified that Gaskins instructed him to help clean the spill.

Plaintiff testified that seeing the diesel fuel caused him to panic, believing that the boat might explode. He testified that while walking back down the same stairway, he became scared and his foot slipped from underneath him on the top step, causing him to fall on his back and buttocks all the way down the metal stairway. According to plaintiff, he reached for a handrail, but his shoulder was displaced as a result of the fall.

In addition to testifying to the smoothness or lack of traction on the top step, plaintiff attributed his alleged accident to the diesel fuel spill. Although he testified that he had walked up and down the vessel's stairway "hundreds of times" without any problem, even in the rain. This was the "first time diesel fuel

ever got on [his] boots."[7]

According to testimony from the chief engineer and assistant engineer, the day tank, which provides fuel for the refrigeration engine, leaked diesel fuel in the refrigeration room. The leak occurred sometime after lunch while the engineers were preparing the purse boats for another set of fishing.[8] The two engineers cleaned the spill within about fifteen minutes.[9] The assistant engineer, Michael Taylor ("Taylor"), testified that cleanup of the soap, water, and fuel filled less than half of a 55 gallon barrel. Neither engineer asked plaintiff for help or even saw plaintiff in the refrigeration room, and neither engineer immediately reported the spill to the captain.[10]

According to the engineers, the leak was limited to the refrigeration room. The chief engineer testified that any overflow from the day tank in the refrigeration room flows through a vent pipe on top of the day tank and that the day tank is not connected to the vessel's main tank, located outside of the refrigeration

---

[7] Testimony of James Joseph. Plaintiff testified that he had stepped in the fuel, which he alleged covered the floor of the refrigeration room and a portion of the deck outside the refrigeration room. Plaintiff also testified that if the engineers had done their job, this alleged accident would not have happened.

[8] Testimony of Eugene Booth; Testimony of Michael Taylor. The Captain's Daily Fishing Report shows that the last fishing set for the day started at 1:14 p.m and ended at 1:50 p.m.

[9] Testimony of Eugene Booth; Testimony of Michael Taylor

[10] *Id.*

room toward the stern of the vessel.[11] A water-tight door and grated flooring in the refrigeration room restrict the fuel from passing from the refrigeration room to the outside deck.[12]

The chief engineer also testified that he and the assistant engineer fill the vessel's main tank with diesel fuel before the vessel leaves the dock and enters the Gulf of Mexico.[13] As the fuel is pumped into the vessel, it flows through the vessel's pipes and a containment tank, located outside the refrigeration room, catches any fuel overflow from the main tank.[14] The engineers testified that the containment tank has never overflowed. Both engineers testified that they did not immediately report the spill in the refrigeration room to the captain.

Plaintiff reported his injury to Gaskins at 7:50 p.m.[15] Gaskins testified that plaintiff came to the pilot house and told him that he had popped his arm out of its socket and that he wanted to see a doctor.[16] Plaintiff was moving his arm up and down while speaking

---

[11] *See also* Testimony of Matthews Gaskins.

[12] Testimony of Eugene Booth; Testimony of Matthews Gaskins; Joint Exhibit No. 8-A.

[13] *Id.*

[14] Testimony of Eugene Booth.

[15] Rec. Doc. No. 59(Joint Stipulations). In addition to the parties' stipulation, the time of the alleged slip and fall is indicated in an incident report. Joint Exhibit No. 1.

[16] Testimony of Matthews Gaskins.

to the captain.[17] According to Gaskins, it is not unusual for crew members to displace their shoulder joint as pogey fishing requires fishermen to use their arms when pulling heavy fish nets. While speaking to Gaskins, plaintiff made no mention of diesel fuel, back pain, or that he had fallen down the stairs.[18]

Gaskins contacted Omega and instructed plaintiff to complete an incident report with the vessel's pilot, Gerald Dove ("Dove").[19] While Dove completed most of the incident form, plaintiff completed a section calling for the employee to "describe [the accident] in detail," writing only that he slipped and fell "on step."[20] Dove testified that plaintiff did not mention diesel fuel on the incident report or during their conversation.[21] Plaintiff told Dove that he slipped on the stairs and that he "fell and hurt his shoulder."[22]

Immediately upon reaching the dock in Cameron, Louisiana, Omega transported plaintiff to Business Health Partners in Sulphur, Louisiana for medical care. Records from Business Health Partners

---

[17] *Id.*

[18] *Id.;* Testimony of James Joseph.

[19] Testimony of James Joseph; Testimony of Matthews Gaskins; Deposition of Gerald Dove, p. 29.

[20] Joint Exhibit No. 1; Testimony of James Joseph; Deposition of Gerald Dove.

[21] Deposition of Gerald Dove, pp. 45-46.

[22] Deposition of Gerald Dove, p. 28, line 22; p. 46.

show that plaintiff complained of pain in his right shoulder and lower back and that he was diagnosed as having a lumbar strain and shoulder strain.[23] Plaintiff reported that he slipped down stairs, but he did not mention falling due to diesel fuel.[24] Omega attempted to interview plaintiff about the alleged accident while en route to and from Business Health Partners, but plaintiff declined to speak and made no mention of diesel fuel.[25]

The morning after the alleged accident, Omega arranged for plaintiff to be examined by Dr. Michael Duval, an orthopedic surgeon. A representative of Omega went to plaintiff's house to transport him to the doctor and to investigate the accident, but plaintiff refused to speak about the alleged accident.[26] Plaintiff told Dr. Duval that he slipped down a stairway, but he said nothing about stepping in diesel fuel.[27] Dr. Duval examined plaintiff's back and shoulder and found no bruising or abrasions.[28] He found some swelling around plaintiff's right deltoid.[29] Despite complaints of

---

[23] Joint Exhibit No. 10.

[24] *Id.*; Testimony of James Joseph.

[25] Testimony of James Joseph.

[26] *Id.* Plaintiff admitted that he refused to speak with Omega until his deposition was taken.

[27] Joint Exhibit No.11 (Record Dated 6/14/2007); Testimony of James Joseph.

[28] Joint Exhibit No.11 (Record Dated 6/14/2007, Addendum Dated 6/26/2007).

[29] *Id.* (Record Dated 6/14/2007).

7

back pain, Dr. Duval found no spasms.[30] At a second visit, Dr. Duval reviewed MRIs of plaintiff's shoulder and lumbar and concluded plaintiff "[m]ore than likely" had a dislocation of his shoulder with spontaneous relocation and a dessication at L4-5 with a small annular tear.[31] Dr. Duval recommended a Medrol Dosepak, prescribed pain medications, and referred plaintiff to physical therapy.[32]

A few weeks later, plaintiff visited Dr. John Cobb, an orthopedic surgeon whom he selected, complaining of "aching pain" and "weakness" in his shoulder and that his "shoulder keeps popping out of place."[33] He also complained of "aching, burning pain in his lower back."[34] Plaintiff testified that he could not recall whether he told Dr. Cobb that he had slipped because of diesel fuel. However, Dr. Cobb's report of plaintiff's history contains no reference to diesel fuel.[35]

Plaintiff visited Dr. Cobb over the course of at least a year. Dr. Cobb noted a "suggestion of anterior subluxation" of plaintiff's right shoulder,[36] and on September 25, 2007, he

---

[30] *Id.*

[31] *Id.* (Record Dated 6/18/2007).

[32] *Id.*

[33] Joint Exhibit No. 13 (Record Dated 7/09/2007).

[34] *Id.*

[35] *Id.*

[36] *Id.*

performed an anterior repair of plaintiff's right shoulder.[37] Dr. Cobb also performed a disectomy and an anterior lumbar fusion on plaintiff's back on April 22, 2008, after he found that steroid injections failed to reduce plaintiff's pain.[38]

## CONCLUSIONS OF LAW

### I. JONES ACT NEGLIGENCE

Negligence under the Jones Act includes any breach of duty that an employer owes to his employees who are seamen[39], including providing for the safety of the crew. *Billedeaux v. Tidex*, No. 91-134, 1993 WL 21420, at *6 (E.D. La. Jan. 27, 1993). A Jones Act employer is responsible for "even the slightest" of negligence. *Theriot v. J. Ray McDermott & Co.*, 742 F.2d 877, 881 (5th Cir. 1984). If the employer's negligent act is found to have caused the plaintiff's injury, in whole or in part, then the employer is liable under the Jones Act. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997). A Jones Act employer is also "legally responsible for the negligence of one of its employees while that employee is acting within the course

---

[37] Joint Exhibit No. 13 (Operative Report Dated 10/08/2007).

[38] Joint Exhibit No. 13 (Operative Report Dated 4/24/2008; 6/02/2008); Testimony of Dr. John Cobb.

[39] The parties agree that Joseph is a seaman for purposes of the Jones Act and general maritime law. Rec. Doc. No. 59, para. 3. The parties also stipulate that the F/V GRAND CHENIERE is a vessel in navigation within the meaning of the Jones Act. *Id.* at para. 4.

and scope of his job." *Bush v. Diamond Offshore Co.*, 46 F. Supp. 2d 515, 520 (E.D. La. 1999)(Fallon, J.).

Employers of seamen have a duty to provide their employees with a reasonably safe place to work. *Id*. Notwithstanding this broad duty, an employer must first "have notice and the opportunity to correct an unsafe condition before liability attaches. The standard of care is not 'what the employer subjectively knew, but rather what it objectively knew or should have known.'" *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989)(quoting *Turner v. Inland Tugs Co.*, 689 F. Supp. 612, 619 (E.D. La. 1988). While a Jones Act employer has a duty to effectively warn employees, there is no duty to "warn seamen of dangers that are 'open and obvious.'" *Patterson v. Allseas USA, Inc.*, 137 Fed. App'x 633 (5th Cir. 2005)(stating that a seaman "should have known the dangers associated with descending a stairway in wet boots.") (quoting *Farrell v. United States*, 167 F.2d 781, 783 (2d Cir. 1948)).

A seaman also has a duty under the Jones Act to "act with ordinary prudence under the circumstances." *Gautreaux*, 107 F.3d at 339. A plaintiff's contributory negligence does not, however, bar his recovery. *Gavagan v. United States*, 955 F.2d 1016, 1019 (5th Cir. 1992). Instead, the plaintiff's negligence operates to reduce or apportion damages in accordance with principles of comparative negligence. *Billedeaux,* 1993 WL 21420, at *7.

## II. UNSEAWORTHINESS

A shipowner owes members of the crew an absolute duty to maintain the vessel as seaworthy. *Phillips v. Western Co.*, 953 F.2d 923, 928 (5th Cir. 1992). A seaworthy vessel is one that is reasonably fit and safe for its intended use. *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002).

The duty of seaworthiness, however, does not extend to providing "a perfect, or accident-free vessel." *Phillips*, 953 F.2d at 928; *Garcia v. Murphy*, 476 F.2d 303, 305 (5th Cir. 1973)(quoting *Lieberman v. Matson Navigation Co*, 300 F.2d 661 (9th Cir. 1962)) ("The standard is not perfection, but reasonable fitness."). While explaining that the duty is not without limits, the United States Court of Appeals for the Fifth Circuit noted that "'a seaman is not absolutely entitled to a deck that is not slippery. He is absolutely entitled to a deck that is not unreasonably slippery.'" *Garcia*, 476 F.2d at 305 (quoting *Colon v. Trinidad Corp.*, 188 F. Supp. 97, 100 (D.C. N.Y. 1960); *see also Pinto v. States Marine Corp. of Del.*, 296 F.2d 1, 4 (2d Cir. 1961) (affirming a jury charge that "the mere momentary presence of oil in that area (the engine room) does not in and of itself render the vessel unseaworthy").

The duty of unseaworthiness is "completely independent of the duty under the Jones Act to exercise reasonable care" and, therefore, the plaintiff is not required to show negligence.

*Phillips*, 953 F.2d at 928(quoting *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988)) (citation omitted)).

The plaintiff must show not only that the vessel was not reasonably suited for its intended use, but he must also show a causal connection between the injury and the alleged breach of duty that rendered the vessel unseaworthy. *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001). Plaintiff's burden is "more demanding" than the plaintiff's burden in a Jones Act claim. *Phillips*, 953 F.2d at 928. Plaintiff must "show that 'the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.'" *Phillips*, 953 F.2d at 928(quoting *Johnson*, 845 F.2d at 1354).

**III. MAINTENANCE AND CURE**

A shipowner has an obligation to pay both maintenance and cure to any seaman injured while in service to the ship. *Boudreaux*, 280 F.3d at 468. Pursuant to this obligation, the shipowner must pay an allowance for subsistence, reimburse the seaman for medical expenses, and take "all reasonable steps to ensure that the seaman receives proper care and treatment." *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987).[40]

---

[40] Maintenance is "the right of a seaman to food and lodging if he falls ill or becomes injured while in service of the ship" and cure provides a seaman "the right to necessary medical services." *Guerva v. Martime Overseas*

The maintenance and cure obligation exists regardless of an employer's fault or a vessel's unseaworthiness. *Id.* Nor is the obligation diminished by a seaman's own negligence. *Boudreaux*, 280 F.3d at 468.

In order to recover maintenance and cure, the plaintiff must prove "(a) his employment as a seaman, (b)that his illness or injury occurred, was aggravated or manifested itself while in the ship's service, (c)the wages to which he may be entitled, and (d) the expenditures or liability incurred by him for medicines, nursing care, board and lodging." *Gorum v. Ensco Offshore Co.*, Nos. 02-2030, 02-2031, 2002 WL 31528460, at *5 (Nov. 14, 2002) (Vance, J.). A seaman is entitled to recover maintenance and cure for injuries or illnesses that pre-existed his employment so long as he did not fraudulently or knowingly conceal his condition. *McCorpen v. Central Gulf Steamship Corp.*, 396 F.2d 547, 549.

A shipowner's obligation to pay maintenance and cure continues until the seaman reaches maximum medical improvement ("MMI"), "where it is probable that further treatment will result in no betterment in the claimant's condition." *Rashidi v. Am. President Lines*, 96 F.3d 124, 128 (5th Cir. 1996). If the condition cannot be cured or if it appears "future treatment will

---

*Corp.*, 59 F.3d 1496, 1499 (5th Cir. 1995).An employer is obligated to pay a seaman's medical expenses even when the seaman selects his own physician unless the employer shows that the treatment was either excessive or unnecessary. *Caulfield v. AC&D Marine, Inc.*, 633 F.2d 1129, 1135 (5th Cir. 1981); *In re The Matter of Cooper/T. Smith Stevedoring Co.*, 942 F. Supp. 267, 269-70

merely relieve pain and suffering but not otherwise improve the seaman's physical condition," then a seaman has reached maximum medical improvement. *Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979).

Plaintiff carries the burden of showing that he has not achieved MMI. *Id.* at 404. However, in the event of conflicting medical opinions with respect to whether a seaman has reached MMI, "a determination to terminate a seaman's right to maintenance and cure" must be unequivocal. *Johnson v. Marlin Drilling Co.*, 893 F.2d 77, 79 (5th Cir. 1990) (citing *Tullos v. Resource Drilling, Inc.*, 750 F.2d 380, 388 (5th Cir. 1985). Any ambiguities or doubts should be resolved in favor of the seaman. *Vaughan v. Atkinson*, 369 U.S. 527, 532, 82 S. Ct. 997, 8 L. Ed. 2d 88 (1962).

A shipowner is not required to instantly begin making payments, but rather a shipowner is permitted to first investigate the claim. *Morales*, 829 F.2d at 1358. However, a shipowner who unreasonably rejects a claim for maintenance and cure is responsible not only for the maintenance and cure payments, but also any compensatory damages that have resulted from the failure to pay, such as aggravation of the injured seaman's condition. *Id.* A failure to pay may be reasonable if "a diligent investigation" reveals that the claim is not legitimate or if the seaman fails to provide medical records to support his

claim." *Id.* at 1360.

A shipowner whose failure to pay is not merely unreasonable but is "arbitrary and capricious, or willful, callous and persistent," may be liable for attorney's fees. *Id.* at 1358[41]. Circumstances where courts have deemed conduct arbitrary and capricious include a shipowner failing to investigate or conducting too lax of an investigation, withholding payments even after learning that such payments are due, ceasing payments in response to a seaman's retention of counsel or a seaman's refusal to accept a settlement offer, and failing to reinstate payments after a new diagnosis. *Id.* at 1360; *Tullos, Inc.*, 750 F.2d at 388.

### *DISCUSSION*

### I. JONES ACT AND UNSEAWORTHINESS

Plaintiff contends that his injury was the result of Omega's negligence and the unseaworthiness of the vessel. Plaintiff alleges

---

[41] The United States Court of Appeals for the Fifth Circuit recognizes "an escalating scale of liability" for failing to pay maintenance and cure:
> a shipowner who is in fact liable for maintenance and cure, but who has been reasonable in denying liability, may be held liable only for the amount of maintenance and cure. If the shipowner has refused to pay without a reasonable defense, he becomes liable in addition for compensatory damages. If the owner not only lacks a reasonable defense but has exhibited callousness and indifference to the seaman's plight, he becomes liable for punitive damages and attorney's fees as well.

*Morales*, 829 F.2d at 1358. Punitive damages are no longer available for willful failure to pay maintenance and cure. *Guerva v. Maritime Overseas Corp.*, 59 F.3d 1496, 1513 (5th Cir. 1995).

that Omega engineers negligently left the refrigeration room unattended, allowing the day tank to overflow, and that Omega failed to maintain a slip-resistant surface on the stairway's top step.

The Court finds that a diesel fuel spill did occur in the refrigeration room of the vessel on June 13, 2007. However, the spill did not cause plaintiff to slip and fall down the vessel's stairway and injure himself.

First, Gaskins did not send plaintiff to investigate or clean a fuel spill since he had no notice of the same until, at the earliest, the spill was cleaned.[42] Plaintiff also did not alert the engineers to the fuel spill.[43] Rather, the chief engineer and assistant engineer, who were responsible for the fuel tanks on the vessel, found the fuel leaking out of the day tank in the refrigeration room and cleaned it without any assistance.[44] Neither engineer asked plaintiff for help or even saw him in the

---

[42] Testimony of Matthews Gaskins; Testimony of Eugene Booth; Testimony of Michael Taylor.
    Gaskins testified that he had no knowledge of a diesel fuel spill. He denied ever smelling fuel, seeing fuel, or hearing about leaking fuel from a nearby vessel. He also testified that plaintiff would not have been the one to check a leak. It was the responsibility of the engineers.

[43] The Court rejects plaintiff's testimony that he found the engineers watching "nasty movies" in the galley and alerted them to the diesel spill. Eugene Booth denied ever watching "nasty movies" in the galley, stating instead that he and Taylor were working on the purse boats. Testimony of Eugene Booth.
    Taylor testified that he had just finished eating lunch and while in the process of preparing the purse boats to catch fish and conducting a round of inspections, he saw the spill. Testimony of Michael Taylor.

[44] Testimony of Eugene Booth; Testimony of Michael Taylor.

refrigeration room.[45]

Second, the fuel had been cleaned well before plaintiff reported his alleged slip and fall. Plaintiff reported his alleged accident around 7:50 p.m., no more than approximately ten minutes after he allegedly fell.[46] However, the diesel fuel spill occurred in the afternoon and it was cleaned within about fifteen minutes. The engineers found the leak sometime before a purse boat was set to be released into the water for another set of fishing,[47] and the Captain's Daily Fishing Report shows that the last fishing set for the day started at 1:14 p.m and ended at 1:50 p.m.[48]

Third, plaintiff did not mention stepping in diesel fuel when telling Gaskins, Dove, or fisherman, Thomas Gates Jr. ("Gates"), about his alleged fall.[49] Plaintiff could not have stepped into diesel fuel on the deck outside of the refrigeration room as he testified. The vessel's main tank was filled before the vessel left the dock.[50] The Court does not believe that the captain and engineers would leave the dock for the Gulf of Mexico with fuel in

---

[45] *Id.*

[46] Joint Exhibit No. 1; Rec. Doc. No. 59. Plaintiff testified that it took him between five to seven minutes to walk from the stairway to the wheelhouse and report his accident to the captain.

[47] Testimony of Eugene Booth; Testimony of Michael Taylor.

[48] Joint Exhibit No. 5.

[49] Testimony of Matthews Gaskins; Testimony of Thomas Gates Jr.; Deposition of Gerald Dove, p. 46.

[50] Testimony of Eugene Booth; Testimony of Matthews Gaskins.

the outside containment tank and with the possibility of fuel spilling from this outside compartment. Furthermore, it is clear to the Court that diesel fuel in the refrigeration room could not have passed through the water-tight door[51] onto the deck, nor could any overflow from the day tank leak into the main overflow containment tank, given testimony by the chief engineer and captain that the tanks are in no way connected.[52] The Court, therefore, discredits the testimony of Dove and plaintiff that the fuel flowed from one tank to the other.[53]

Fourth, with respect to plaintiff's alleged slip and fall, there were no witnesses to the same. Gates testified that plaintiff was sitting on the bottom step of the stairs when plaintiff, without any further explanation, told him that he had just fallen down the steps. Gates was not an eyewitness. Instead, he merely saw plaintiff sitting on the bottom step. The only unusual thing he noticed was that plaintiff was wet. Moreover, Gates appeared to the Court to have much difficulty remembering what had occurred. For example, Gates did not know what plaintiff was wearing or what time of the day he saw plaintiff other than "during the day."[54]

---

[51] Testimony of Eugene Booth.

[52] Testimony of Eugene Booth; Testimony of Matthews Gaskins.

[53] Deposition of Gerald Dove p. 64, line 24.

[54] Testimony of Thomas Joseph Gates, Jr.

Fifth, no one saw any cuts, bruises, or other marks indicating that plaintiff had just fallen on his back and buttocks down several metal stairs built with serrated grating. Neither Gates nor Dove, who both allegedly saw plaintiff right after the alleged accident, saw any marks.[55]  Plaintiff also acknowledged that he received no scrapes, cuts, or bruises.[56]

Sixth, when plaintiff reported his injury to the captain, he never mentioned that he slipped and fell down steps, only that he displaced his shoulder.[57] The Court rejects plaintiff's testimony that he did not tell the captain about the fall because he was in too much pain. After the alleged accident, he never spoke to the captain again despite his testimony that he was concerned about everyone's safety.[58]  Plaintiff's testimony that he was not comfortable talking to the captain, who has known plaintiff since he was a teenager,[59] who rehired plaintiff to work on the GRAND CHENIERE after plaintiff had been terminated from Omega Protein,

---

[55] *Id.*; Deposition of Gerald Dove, pp. 68-69.

[56] Testimony of James Joseph.

[57] Testimony of Matthews Gaskins.

   In a section of the incident report form that asks for the employee to "describe in detail how incident occurred," plaintiff did not describe falling down a stairway. Instead, he wrote that he slipped and fell "on step."

[58] Testimony of Matthews Gaskins; Testimony of James Joseph.

[59] Testimony of James Joseph.

and who considered plaintiff "like a son,"[60] is not worthy of belief. The Court also does not accept plaintiff's explanation that he was too uncomfortable to talk to an investigator for Omega, the same company for which plaintiff intended to continue working during the rest of his work-life.[61] Less than thirty days later, plaintiff filed a lawsuit.[62]

Seventh, there have been no reports of anyone slipping on, falling down, or complaining about the stairway of the GRAND CHENIERE. Gaskins worked aboard the vessel for 15 to 16 years and he is unaware of anyone falling down the stairs or having any problems on the stairs.[63] In Dove's 15 years working aboard the GRAND CHENIERE, he has also never had a problem or received any reports about anyone slipping on the stairs.[64] Omega provides crewmembers with skid-proof boots,[65] and Omega also conducts regular inspections of the vessel. Just five days before the alleged slip and fall, Omega employees, including plaintiff, conducted vessel inspections. Every report, including one signed by plaintiff,

---

[60] Testimony of Matthews Gaskins.

[61] Testimony of James Joseph.

[62] *Id.*

[63] *Id.*

[64] Deposition of Gerald Dove, p. 69, lines 8-20. Gates also testified that he never had a problem on the steps. Testimony of Thomas Gates Jr.

[65] Testimony of Matthews Gaskins.

indicates the ladders were "free of slip and trip hazards."[66]

Finally, during the course of the trial, plaintiff testified that he had submitted false tax returns to the Internal Revenue Service. After omitting income from previous tax returns, plaintiff employed a certified public accountant to amend his tax returns. Plaintiff admitted that he then falsely told a CPA that he earned $300 a day, six days a week while working as an oyster fisherman. Although plaintiff earned some income from oyster fishing, he did not earn a regular, flat amount of $300 a day.[67] Plaintiff also acknowledged that he had a prior felony conviction for possession with the intent to distribute cocaine.

In light of the above-mentioned facts and the Court's serious concerns about plaintiff's credibility, plaintiff has not sustained his burden of proof that he slipped due to diesel fuel or that he slipped and fell down the vessel's stairway at all. The Court is not convinced that plaintiff ever had an accident on the stairway of the GRAND CHENIERE.

Given plaintiff's failure to sustain his burden of proof that an accident as described by plaintiff occurred on the GRAND CHENIERE, the Court finds that Omega was not negligent, in whole or

---

[66] Joint Exhibit No. 3. Plaintiff testified that although the pilot completed his form because he could not read or write, he "made sure everything was fine."

[67] Although plaintiff's testimony was unclear, it appears that he earned income from cutting grass and oyster fishing with his father.

21

in part, in causing plaintiff's shoulder injury or back injury. *See Gautreaux*, 107 F.3d at 335. Although the Court finds plaintiff injured his right shoulder while in the service of the vessel, it is unclear to the Court how the injury occurred.

The Court also finds that plaintiff has not sustained his burden of proof with respect to his claim of unseaworthiness. Despite plaintiff's allegations and proffered evidence that the vessel's stairway could have been safer,[68] plaintiff has not demonstrated that the stairway played any part, let alone a substantial part, in causing his injury. *See Phillips*, 953 F.2d at

---

[68] Testimony of James Joseph; Testimony of Robert E. Borison.

Borison, plaintiff's safety expert with respect to marine safety accidents on uninspected vessels, examined the GRAND CHENIERE on December 10, 2007. He found that the carbon steel diamond plate used on the top step of the stairway had become worn in the middle. He also testified that initially defendant properly painted the diamond plate using paint with a non-skid additive, but defendant then twice painted the step with an epoxy paint, which did not contain any non-skid additives. Borison concluded that in the absence of non-skid additives or non-skid tape, the diamond plate on the top step becomes slippery when wet.

According to Borison, a step made with serrated grating is preferred, but diamond plate is slip-resistant when properly maintained. Borison acknowledged that there were no reported slips on the step. He noted, however, that a lack of accidents does not indicate a safe step. It just means those who used the steps were "lucky."

Stairways that have worn tread or traction or that lack non-skid surfaces may create an unseaworthy condition on a vessel. However, such factors alone may not necessarily compel a finding of unseaworthiness. For instance, in *Harris v. Omega Protein, Inc.*, another section of this Court found that even though the non-skid surface of a stairway was worn and the diamond plate, which had been painted, no longer provided traction, the vessel was not unseaworthy because the defendant regularly inspected the stairway and had received no reports of any danger. *Harris v. Omega Protein, Inc.*, No. 04-2580, 2006 WL 2067717, at *4 (E.D. La. July 20, 2006) (Lemmon, J.). On the other hand, in *Levine v. Zapata Protein, Inc.*, where a stairway's condition of worn tread and lack of a skid-proof surface persisted for a long time period and several others had slipped, the Court deemed the vessel unseaworthy. 961 F. Supp. 942, 945 (E.D. La. 1996) (Fallon, J.); *see also Courville v. Cardinal Wirelinespecialists, Inc.*, 775 F. Supp. 929, 936 (W.D. La. 1991)(finding a stairway unseaworthy where non-skid tape had been removed and another crew member testified to having a problem with the steps).

928(quoting *Johnson*, 845 F.2d at 1354). Accordingly, the Court need not determine whether the stairway was reasonably fit for its intended use.

## II. MAINTENANCE AND CURE

Plaintiff claims that he is entitled to maintenance and cure for his shoulder and back injuries in addition to attorney's fees for Omega's failure to pay maintenance and cure.

Both plaintiff's subjective history and objective findings by the physicians indicated a shoulder injury. An MRI of plaintiff's right shoulder, dated June 14, 2007, revealed an area of contusion, extensive edema, and increased signal in the glenoid labrum.[69] Reviews of the MRI by both Dr. Duval and Dr. Cobb indicated injury to plaintiff's right shoulder. Dr. Duval noted a dislocation of plaintiff's shoulder with spontaneous relocation,[70] and Dr. Cobb concluded that plaintiff had an anterior subluxation, which caused the shoulder to move out of place but not permanently dislocate.[71] Dr. Cobb also testified that the edema, a swelling of the soft tissue, is indicative of a recent injury.

Examinations of plaintiff's back, however, did not yield any objective findings of recent injury. An MRI of plaintiff's lumbar,

---

[69] Joint Exhibit No. 12.

[70] Joint Exhibit No. 11 (Record Dated 6/18/2007).

[71] Joint Exhibit No. 13 (Record Dated 7/9/2007); Testimony of Dr. John Cobb.

also dated June 14, 2007, revealed a disc desiccation[72] and a central annular tear at plaintiff's L4-5 disc.[73] However, both a pre-employment MRI, dated April 9, 2007, and an MRI taken on November 27, 2007, months after the alleged accident, showed an identical condition with "no appreciable change."[74] Unlike the shoulder MRI, there was no indication of recent injury.

Neither Dr. Duval nor Dr. Cobb found any bruising, abrasions, or cuts when conducting a physical examination of plaintiff.[75] Both doctors also failed to find any spasms, which Dr. Cobb acknowledged is a typical sign of low back pain.[76] Both reported normal neurological exams.[77] While Dr. Duval noted in his report that plaintiff did not have any "obvious discomfort" while raising a straight leg,[78] Dr. Cobb found that a straight leg raise induced

---

[72] Dr. Duval explained a disc desiccation as "dehydration of the disc which is an age-related degenerative change." Deposition of Michael Duval, M.D. Dr. Cobb also characterized it as a dehydration "associated with progressive wear and tear." Testimony of Dr. John Cobb.

[73] Joint Exhibit No. 10.

[74] Joint Exhibit No. 13 (Record Dated 12/12/2007). Dr. Cobb acknowledged that the MRI findings before and after the alleged accident were "essentially the same." Testimony of Dr. John Cobb.

[75] Joint Exhibit No. 11 (Record Dated 6/14/2007 and Addendum Dated 6/26/2007); Testimony of Dr. John Cobb.

[76] Joint Exhibit No. 11 (Record Dated 6/14/2007); Joint Exhibit No. 13 (Record Dated 7/09/2007); Testimony of Dr. John Cobb.

[77] *Id.*

[78] Joint Exhibit No. 11 (Record Dated 6/14/2007).

pain in plaintiff's back.[79] However, he testified that such a test is not diagnostic. Dr. Cobb also testified that he performed a discogram, confirming the location of plaintiff's pain. However, the test does not convince the Court that it was the alleged accident that aggravated plaintiff's pre-existing back condition.

In light of the physicians' findings and the MRIs reviewed by both Dr. Duval and Dr. Cobb, the Court finds plaintiff injured his right shoulder on June 13, 2007 while in the service of the GRAND CHENIERE, although it is unclear to the Court how plaintiff sustained the injury.

With respect to plaintiff's back, there is no credible objective evidence that plaintiff injured his back during his service to the vessel. As mentioned, plaintiff had a pre-existing degenerative back condition, and neither post-accident MRIs nor physical examinations by either physician objectively show that plaintiff's condition worsened during his service to the vessel. The Court also notes that when plaintiff reported the alleged accident to Gaskins and Dove, he did not mention back pain.[80] In addition, the Court questions plaintiff's credibility for reasons set forth by the Court during its discussion of the Jones Act and unseaworthiness claims. The Court, therefore, finds plaintiff neither injured his lower back nor aggravated his prior back

---

[79] Joint Exhibit No. 13 (Record Dated 7/09/2007).

[80] Testimony of Matthews Gaskins; Deposition of Gerald Dove, p. 28.

condition while in the service of the vessel.[81]

With respect to plaintiff's right shoulder, he is entitled to payments for maintenance and cure until he attained MMI. The parties stipulated that plaintiff reached MMI with respect to his shoulder on December 12, 2007 and that his medical expenses with respect to his shoulder total $6,726.94, of which $1,260 Omega has already paid.[82] The parties also stipulated to a maintenance rate of $20 a day. As such, plaintiff is entitled to maintenance payments at a rate of $20 a day from June 14, 2007[83] until December 12, 2007 and a total of $5466.94 in cure payments.

Plaintiff is not entitled to attorney's fees or compensatory damages for Omega's failure to pay maintenance and cure. Omega was neither arbitrary and capricious nor unreasonable, given the Court's findings that Omega brought plaintiff to a facility for medical treatment immediately after the vessel docked, scheduled a visit with an orthopedic surgeon the day after the alleged accident, and initiated an investigation, in which plaintiff refused to participate.

---

[81] The Court recognizes that any doubts must be resolved in favor of the plaintiff. *See Vaughan*, 369 U.S. at 532.

[82] Rec. Doc. No. 59, para. 7.

[83] He worked the full day on June 13, 2007. The Captain's Daily Fishing Report shows the vessel returned at 8:20 p.m. Joint Exhibit No. 5.

### *CONCLUSION*

Based on the foregoing findings of fact and conclusions of law,

**IT IS ORDERED** that judgment is rendered in favor of plaintiff, James Joseph, and against defendant, Omega Protein, Inc., with respect to plaintiff's claim for maintenance and cure for his right shoulder, entitling plaintiff to maintenance at a rate of $20 a day from June 14, 2007 until December 12, 2007, and $5466.94 for cure.

**IT IS FURTHER ORDERED** that all other remaining claims in the above-captioned case are **DISMISSED WITH PREJUDICE**, each party to bear his/its own costs.

New Orleans, Louisiana, November <u>14th</u>, 2008.

_____
**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**

27